```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
```
───────────────────────────────

LANCE WOLCOTT,

                Plaintiff,        17-CV-1307

      v.                        **DECISION**
                                                      **and ORDER**

COMMISSIONER OF SOCIAL SECURITY,

                Defendant.

───────────────────────────────

## **INTRODUCTION**

Plaintiff Lance Wolcott ("Plaintiff"), who is represented by counsel, brings this action pursuant to the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner"), denying his application for Disability Insurance Benefits ("DIB"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. § 405(g). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. Dkt. ##9, 14.

## **BACKGROUND**

### **A. Procedural History**

On April 7, 2014, Plaintiff filed an application for DIB alleging disability beginning January 1, 2007, due to knee problems, high cholesterol, high blood pressure, and arthritis. T. 157-65.[1] His application was initially denied. T. 71-74.

---

[1] Citations to "T.__" refer to the pages of the administrative transcript. Dkt. #7.

Plaintiff then attended a hearing, with counsel, before Administrative Law Judge ("ALJ") Gregory Hamel on June 6, 2016. T. 33-64.

On September 28, 2016, the ALJ issued an unfavorable decision, T. 15-30, and the Appeals Council denied review on October 23, 2017, making the ALJ's determination the final decision of the Commissioner. T. 1-7. This action followed. Dkt. #1.

The issue before the Court is whether the Commissioner's decision that Plaintiff is not disabled is supported by substantial evidence and free of legal error. See Pl. Mem. (Dkt. #9-1) 18-26; Comm'r Mem. (Dkt. #14-1) 11-19.

**B.  The ALJ's Decision**

In applying the familiar five-step sequential analysis, as contained in the administrative regulations promulgated by the Social Security Administration ("SSA"), see 20 C.F.R. §§ 404.1520, 416.920; Lynch v. Astrue, No. 07-CV-249, 2008 WL 3413899, at *2 (W.D.N.Y. Aug. 8, 2008) (detailing the five steps), the ALJ found: (1) Plaintiff did not engage in substantial gainful activity between the alleged onset date, January 1, 2007, and the date last insured; (2) he had the severe impairment of degenerative arthritis of knees status post repair of the right knee; (3) his impairment did not meet or equal the Listings set forth at 20 C.F.R. § 404, Subpt. P, Appx. 1. The ALJ found that Plaintiff retained the residual functional capacity ("RFC") to perform medium work except that he could not climb ladders and similar devices and work in

hazardous environments; (4) Plaintiff was unable to perform his past relevant work as a rough carpenter; and (5) considering Plaintiff's age, education, work experience, and RFC, he could perform the jobs of hand packager and laundry worker. The ALJ concluded that Plaintiff was not disabled. T. 20-28.

**DISCUSSION**

**A. Scope of Review**

A federal court should set aside an ALJ decision to deny disability benefits only where it is based on legal error or is not supported by substantial evidence. Balsamo v. Chater, 142 F.3d 75, 79 (2d Cir. 1998). "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Green-Younger v. Barnhart, 335 F.3d 99, 106 (2d Cir. 2003) (internal quotation marks omitted).

**B. Plaintiff's Motion**

Plaintiff argues that the ALJ's decision was unsupported by substantial evidence due to the ALJ's misapplication of the treating physician rule and an erroneous credibility analysis. Pl. Mem. 18-25. A brief summary of the record evidence follows, as relevant to Plaintiff's motion.

1. Medical Evidence

Plaintiff received medical treatment for knee injuries beginning in the 1990s. T. 308, 356. He underwent arthroscopic surgery on the right knee in 1990. Follow-up appointments revealed,

among other things, meniscus tear and cruciate deficiency. T. 307, 355.

Plaintiff returned to treatment in 2002 upon complaints of knee pain. T. 305, 353. X-rays at that time revealed that the knee was "markedly degenerative with varus deformity." T. 353.

Plaintiff had five Depo-Medrol and Marcaine injections between April 19, 2004 and March 29, 2006. T. 304-05, 311, 352-53, 357. Treatment notes from that time indicated "marked degenerative changes" in the knee. T. 305, 353.

By January 19, 2007, Plaintiff's pain had not improved. T. 312, 358. He received three Synvisc injections in the right knee between February and March, 2007. T. 313, 316-18, 359-62.

The following year, Plaintiff began to treat with John Repicci, M.D., for complaints of knee pain. T. 285. By that time Plaintiff had undergone multiple injuries and arthroscopic surgeries to the right knee. Id. He indicated that he had been working "building pole lines," and functioning at a reasonable level, but had discomfort in the right knee with significant bowing. Id. Dr. Repicci noted that Plaintiff had a complete loss of the medial joint space in the weight bearing position, and assessed degenerative arthritis of the right knee affecting most severely the medial compartment, Ahlback grade IV [moderate bone attrition], with degenerative changes involving the patella and lateral compartment. Id. Dr. Repicci noted that while Plaintiff was "rather young for a total joint replacement," he would "in all likelihood,

require a total knee replacement at a future date." T. 286. Plaintiff sought to continue working for another year to "achieve some sort of pension status." Id.

Following an MRI in March, 2008, Dr. Repicci assessed degenerative arthritis of the right knee affecting most severely the medial compartment with tear of the medial meniscus and absence of the ACL. T. 288. He recommended that Plaintiff "find alternate employment." T. 289.

Following arthroscopic surgery on the right knee, Plaintiff saw Dr. Repicci on April 9, 2008. T. 290. Dr. Repicci's treatment notes from that date indicate:

> The knee arthritis is too far advanced for segmental arthroplasty. He will require a total knee replacement at some time. He is trying to work on construction with a significant arthritic knee. From an x-ray standpoint or clinical standpoint, the knee is ready for total joint replacement. He is in a little younger age group. Should he choose a total knee, he would have to give up construction type work. He is considering his options. The patient obviously has a significant disability.

T. 290.

Plaintiff did not seek treatment again until April, 2014, when he presented with bilateral knee pain while standing, walking, or changing position. T. 291. Dr. Repicci noted that "he has essentially failed conservative management. Both his knees are symptomatic at this time." Id. Plaintiff used a cane intermittently for ambulation and exhibited a limp favoring both lower

-5-

extremities. T. 291-92. A left and right total knee replacement were contemplated. Id.

On April 15, 2015, Plaintiff saw Frederick Wagner, RPA-C, who noted that Plaintiff had "left knee pain, severe varus [degenerative joint disease] of the left knee with bone on bone contact." T. 320. A knee injection was administered which he reported "helped a lot" at a follow-up appointment in May, 2015. Examination revealed varus alignment, crepitus, effusion, and normal tibial step-off of the right, tenderness over the right medial aspect and medial patellar facet, strength diminished on the right, and patellar grind test positive on the right. T. 325-26, 368-69.

Between July, 2015 and January, 2016, Plaintiff treated with Danilo Saldana, M.D., for hand and knee pain. T. 344, 346, 348, 350. During that time Plaintiff was assessed with inflammatory arthritis, degeneraqtive joint disease, and knee pain. Id. He took prednisone. Heat, weight loss, and range of motion exercises were recommended. Id.

2. Non-medical and Testimonial Evidence

Plaintiff was born in 1954 and was 52 years-old on his alleged onset date. T. 27, 157, 164. He had a high-school education and worked as a carpenter. He was insured for DIB purposes through September 30, 2012. T. 20, 22, 27, 58, 65-66, 202, 207, 228-29, 233.

On May 31, 2016, Randy Ford, owner of Ford Builders, completed a work activity questionnaire regarding Plaintiff's former employment. T. 281. Mr. Ford indicated that the Plaintiff was employed as a laborer, with an hourly wage of $15.00 at 30 hours per week. Id. He noted that the Plaintiff did not complete all the usual duties required for his position, was not able to complete all of the job duties without special assistance, did not report regularly for work as scheduled, and did not complete his work in the same amount of time as employees in similar positions. Plaintiff was assigned fewer/easier duties, worked irregular hours, and had lower production (60%) and quality standards than other employees. T. 281-82.

At the administrative hearing, Plaintiff testified that he became disabled on January 1, 2007, but had worked on and off for Ford Builders until December of 2014. T. 38. He stated that he had only worked for approximately one month in 2015 doing "gofer" work for his friend while they remodeled Dibble Family Center in Batavia, New York. Prior to Ford Builders, the last time the Plaintiff had significant earnings was around 2006, as a union carpenter.

Plaintiff worked since 1990 as a union carpenter in Rochester. T. 39-40. The work entailed building parking ramps and bridges, laying the concrete floor work, tiering planks, setting up scaffolding. T. 46-7. He testified that he stopped working in 2006 when his knees and legs were "shot" and his knees became "bone to

bone." As such he could no longer get union jobs. T. 47. Plaintiff supported himself on savings and a pension of $521.00, he sold his house, and at the time of the hearing, was living in a house his father used to own with a deceased friend's girlfriend. T. 40.

Plaintiff's daily activities were watching TV, lying down on the couch, and reading newspapers. T. 41. His housemate did the household chores, including dishes, laundry, picking up, and making meals. Plaintiff did not assist her with those tasks. T. 41-42. Plaintiff testified that he mowed the lawn with a riding lawnmower for 20 minutes at a time and drove to and from his mother's nursing home for 30 minutes daily. He also drove to the grocery store where his housemate would shop for him. T. 42-43, 52.

Plaintiff testified to having had three or four operations on his right knee, dating back to the 1990s. T. 47. He stated that Dr. Repicci wanted to put a plastic knee in, but could not do so because the ligaments needed to hold and support the knee on the right were gone. T. 48. He further stated that Dr. Repicci wanted to replace his knees, but that Dr. Repicci did not take his insurance and he had to find another doctor as a result. Id.

Plaintiff told the ALJ that he had a hard time getting off the couch and that he sleeps on the couch, with the bathroom five feet away. T. 50. He would "rock" himself to get off the couch. T. 53. Plaintiff stated that he currently had pain all day long in both knees, his shoulders were "all crunchy," and his fingers were numb.

Id. To ease his pain, he would try to stay off his legs, and alternate heat and ice about five or six times per day. T. 51.

Plaintiff testified that he could stand for approximately 10 minutes, sit for about a half hour, and could lift about as much as a gallon of milk. T. 53. He used to enjoy golfing, playing basketball, and playing football, but now could not do any of those activities. T. 54-55.

**C. Analysis**

With regard to the opinion evidence, the ALJ discounted Dr. Repicci's statements insofar as they opined that Plaintiff was totally disabled. T. 26.

Pursuant to 20 C.F.R. §§ 404.1527(c)(2) and 416.927(c)(2), a treating source's opinion will usually be given more weight than a non-treating source. If it is determined that a treating source's opinion on the nature and severity of a plaintiff's impairment is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," the opinion is given controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). If the opinion, however, is not "well-supported" by "medically acceptable" clinical and laboratory diagnostic techniques, then the opinion cannot be entitled to controlling weight. Id.

If the treating source's opinion is not given controlling weight, the ALJ considers the following factors in weighing the opinion: length of treatment relationship, frequency of

examination, nature and extent of the treatment relationship, relevant evidence used to support the opinion, consistency of the opinion with the entire record, and the expertise and specialized knowledge of the source. See 20 C.F.R. §§ 404.1527(c)(2)-(6), 416.927(c)(2)-(6); SSR 96-2P, 1996 WL 374188, at *2 (S.S.A. July 2, 1996).[2] "While an ALJ may discount a treating physician's opinion if it does not meet this standard, the ALJ must 'comprehensively set forth [his] reasons for the weight assigned to a treating physician's opinion.'" Pilarski v. Comm'r of Soc. Sec., No. 13-CV-6385, 2014 WL 4923994, at *2 (W.D.N.Y. Sept. 30, 2014)(quoting Halloran v. Barnhart, 362 F.3d 28, 33 (2d Cir. 2004)).

The extent of the ALJ's evaluation of the opinion evidence was to afford "limited weight" to the treating orthopedist's statement that Plaintiff was "totally disabled." T. 26. It is unclear from the decision whether he also rejected Dr. Repicci's examination findings as insufficient medical evidence. While it is true that the issue of disability is ultimately reserved to the Commissioner, see Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999), the treatment records contain objective medical findings based upon multiple examinations and diagnostic imaging of Plaintiff that could support Dr. Repicci's disability opinion. Comm'r Mem. 14; T. 303-414. Indeed, Plaintiff's history of treatment reveals that

---

[2] SSR 96-2P was rescinded by Federal Register Notice Vol. 82, No. 57, page 15263 effective March 27, 2017, after the date of the ALJ's decision.

-10-

his knee impairment is degenerative in nature and did not improve with time.[3]

Nor did the ALJ cite to any medical opinion to support his finding. T. 23-28. Although the Commissioner is correct that where "the record contains sufficient evidence from which an ALJ can assess the [claimant's] residual functional capacity," a medical source statement or formal medical opinion is not necessarily required, Tankisi v. Comm'r of Soc. Sec., 521 Fed. Appx. 29, 34 (2d Cir. 2013) (summary order), such is not the case here because the Court cannot determine what evidence the ALJ relied upon in formulating the RFC. See Comm'r Mem. 15; ; see Hogan v. Astrue, 491 F. Supp. 2d 347, 354 (W.D.N.Y. 2007) (remand required where ALJ did not cite to a medical opinion in the record and it was unclear whether the ALJ relied on the opinions of plaintiff's treating physicians, or the opinions of the examining and consulting physicians).

There is also no medical opinion in the record regarding Plaintiff's ability to lift and carry up to 50 pounds as required for medium work.[4] This too was error. See Bathrick v. Astrue,

---

[3] Contrary to the Commissioner's suggestion, Dr. Repicci was a treating physician under the relevant regulations. Comm'r Mem. 14. The ALJ did not find that Dr. Repicci was not a treating source, T. 25, 26, and the Court reminds the Commissioner that "[a] reviewing court may not accept appellate counsel's post hoc rationalizations for agency action." Snell, 177 F.3d at 134.

[4] Under Social Security Ruling ("SSR") 83-10, "[th]e regulations define medium work as lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds.

A full range of medium work requires standing or walking, off and on, for a total of approximately 6 hours in an 8-hour workday in order to meet the requirements of frequent lifting or carrying objects weighing up to 25 pounds

-11-

No. 11-CV-101, 2012 WL 1068985, at *4 (D. Conn. Mar. 29, 2012) (medical opinions and facts of record did not provide enough evidence to support the conclusion that claimant could perform medium work because they did not specify her lifting ability).

Instead, the ALJ's RFC determination heavily relied on Plaintiff's activities of daily living, which included visiting his mother at a nursing home, and driving a riding lawnmower. T. 24, 26. This is insufficient to show that Plaintiff is capable of performing medium work. See Bathrick, 2012 WL 1068985, at *4 (claimant's daily activities of going to coffee, grocery shopping, and household chores did not, alone, support an RFC finding of medium because they did not indicate how much weight claimant could lift or carry); see also, Caldwell v. Berryhill, No. 17-CV-6486, 2019 WL 135557, at *9 (E.D.N.Y. Jan. 7, 2019) ("Plaintiff's activities of daily living during the relevant period do not speak to how much weight Plaintiff could lift or carry . . . ."). [5]

---

. . . .

*The considerable lifting required for the full range of medium work usually requires frequent bending-stooping . . . . Flexibility of the knees as well as the torso is important for this activity. . . .*

In most medium jobs, being on one's feet for most of the workday is critical. Being able to do frequent lifting or carrying of objects weighing up to 25 pounds is often more critical than being able to lift up to 50 pounds at a time." SSR 83-10 (emphasis added).

[5] At the time of the administrative hearing, Plaintiff was an individual of advanced age. The ALJ determined that he could not perform his past relevant work. T. 27. In light of these factors, the Medical-Vocational Guidelines, could have resulted in a finding that Plaintiff was disabled if he was unable to perform sustained medium exertional work. See 20 C.F.R. Pt. 404, Subpt. P, Appx. 2, Rules 201.6, 201.14, 202.6.

Relatedly, the ALJ did not provide a function-by-function assessment of Plaintiff's ability to perform the exertional requirements of medium work. T. 23. The ALJ found that Plaintiff was capable of medium work with the exceptions of climbing ladders and similar devices and working in hazardous environments. T. 23. Later, he concluded that "[t]he physical examination findings in general as well as the claimant's testimony about his activities support the residual functional capacity." T. 26.

While "an explicit function-by-function analysis" is not required, the RFC determination must "afford[ ] an adequate basis for meaningful judicial review, appl[y] the proper legal standards, and [be] supported by substantial evidence such that additional analysis would be unnecessary or superfluous . . . ." Cichocki v. Astrue, 729 F.3d 172, 177 (2d Cir. 2013). "Remand may be appropriate, however, where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." Id. Here, the record is insufficient for the Court to determine whether Plaintiff can satisfy the requirements for medium work. See Sierra v. Astrue, No. 11-CV-0088, 2012 WL 4490957, at *4 (N.D.N.Y. Sept. 28, 2012)(ALJ's "failure to clearly identify the precise limitations of function makes it difficult for the Court to assess whether the RFC assessment is supported by substantial evidence."); Lecler v. Barnhart, No. 01 CIV. 8659, 2002 WL 31548600, at *5 (S.D.N.Y. Nov.

14, 2002)("[I]n assessing RFC, the Commissioner must make his own findings, specifying what functions a plaintiff is capable of performing, and not simply make conclusory statements regarding a plaintiff's RFC.") (citing 20 C.F.R. § 404.1546 and <u>Townley v. Heckler</u>, 748 F.2d 109, 113 (2d Cir. 1984).

Plaintiff also challenges the ALJ's credibility analysis. Pl. Mem. 23-25. Because the Court finds that remand is required to correct the errors discussed above, it need not address Plaintiff's remaining contention. <u>See Rosa v. Callahan</u>, 168 F.3d 72, 82 n.7 (2d Cir. 1988) ("Because we have concluded that the ALJ was incorrect in her assessment of the medical evidence, we cannot accept her conclusion regarding . . . credibility."); <u>Wilson v. Colvin</u>, 107 F. Supp.3d 387, 407 n.34 (S.D.N.Y. 2015) (since the ALJ failed to develop the record, the Commissioner must "necessarily" reassess a claimant's RFC and credibility on remand); <u>Rivera v. Comm'r of Soc. Sec.</u>, 728 F. Supp.2d 297, 331 (S.D.N.Y. 2010) ("Because I find legal error requiring remand, I need not consider whether the ALJ's decision was otherwise supported by substantial evidence.") (internal citations omitted).

In summary, remand is required to correct the multiple errors discussed above. <u>See Hogan</u>, 491 F. Supp. 2d at 345 (ALJ's residual functional capacity finding was erroneous where: it was unclear whether ALJ relied on the opinions of claimant's treating physicians or those of the examining and consulting physicians, further development of the record was needed as to claimant's

ability to perform basic work activities, ALJ failed to provide the required function-by-function analysis of claimant's ability to perform all the exertional requirements of sedentary work, ALJ failed to include a narrative describing how the evidence supported each conclusion).

## **CONCLUSION**

For the foregoing reasons, the Court finds that the Commissioner's decision contains legal error and is unsupported by substantial evidence. Therefore, it is reversed. Accordingly, Plaintiff's motion for judgment on the pleadings (Dkt. #9) is granted to the extent that the matter is remanded for further administrative proceedings consistent with this opinion. The Commissioner's motion for judgment on the pleadings (Dkt. #14) is denied. The Clerk of Court is directed to close this case.

ALL OF THE ABOVE IS SO ORDERED.

S/Michael A. Telesca
_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

Dated:   Rochester, New York
         April 17, 2019